IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IRON BRANCH ASSOCIATES, LP     :    **CIVIL ACTION**
                                     :
             v.                 :    **NO.  21-463**
                                     :
THE HARTFORD FIRE INSURANCE    :
COMPANY                            :

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                              **September 9, 2021**

      Owners of residential rental communities hiring builders for significant renovations often define their obligations in detailed form construction contracts which require the builder obtain a performance bond to ensure there is money available from an insurer to finish the renovations should the builder default in performance. The owner and builder may agree to limit each other's liability for liquidated or consequential damages upon default in the construction contract. And the builder and the insurer will also set the insurer's obligations under a performance bond. We today address the interplay in language in a construction contract limiting the builder's liability and language in a performance bond which first incorporates the construction contract limiting the insurer's liability to be coextensive with the builder's liability but also adds language concerning possible additional obligations by the insurer to the owner. We read these two commercial contracts together consistent with a common law principle of an insurer's coextensive liability with the builder to the owner and the contracts' terms. We interpret the performance bond to impose liability upon the insurer consistent with what the owner and builder agreed as to consequential damages. We also find genuine issues of material fact as to limited categories of the owner's claimed damages as we are presently uncertain whether they are consequential damages.

I.      **Undisputed facts**[1]

Iron Branch Associates, LP owns the Village at Iron Branch, a housing development administered by the United States Department of Housing and Urban Development and the Delaware Housing Authority.[2]

*Iron Branch hires Petrucon to renovate the Village.*

Iron Branch hired non-party Petrucon Construction, Inc. in June 2017 to renovate the Village in exchange for payments totaling $4,768,762.00.[3] Iron Branch and Petrocon defined their agreements in three documents collectively referred to as the "Construction Contract."[4] Iron Branch and Petrocon agreed to several terms material to our analysis today:

- Iron Branch may terminate "for cause" if Petrucon disregarded applicable laws and regulations, and failed to supply sufficient skilled workers and materials, pay subcontractors, or substantially fulfill its duties under the Construction Contract;[5]

- Petrucon must purchase a one-hundred percent payment and performance surety bond;[6]

- If Petrucon did not timely complete the project, the architect could terminate the Construction Contract giving Iron Branch the option to: (1) complete the work itself and take possession of Petrucon's materials and equipment with Petrucon—and its sureties—responsible for damages because of Petrucon's "refusal or failure" to timely complete the work; or (2) Iron Branch can complete the work itself and deduct reasonable costs of correcting the deficiencies or defects from the balance owed to Petrucon, including the additional costs, if any, of Iron Branch's architect;[7]

- Iron Branch may recover its additional costs and damages incurred due to Petrucon's default, provided the damages are not otherwise expressly waived but the parties agreed

Petrucon is not liable for liquidated damages arising from delay and liquidated damages are "not applicable"[8] nor is it liable for consequential damages including damages for "rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons." [9]

### *Petrucon obtains performance and payment bonds.*

Petrucon purchased the performance and payment bonds required by the Construction Contract from Hartford Fire Insurance Company.[10] The bonds define the Owner as Iron Branch, the Contractor as Petrucon, and the Surety as Hartford Fire Insurance Company.[11]

The Performance Bond incorporated the Construction Contract.[12] Petrucon and Hartford agreed to jointly and severally bind themselves to perform the Construction Contract.[13] The Performance Bond defines when Hartford's obligations are triggered and Hartford's obligations should Petrucon default.[14]

As relevant today, in the event of Petrucon's default and Iron Branch's satisfaction of the required conditions, Hartford must obtain bids from qualified contractors, select a contractor to complete the Construction Contract with Iron Branch's approval, and pay Iron Branch damages defined in Section 7 of the Performance Bond resulting from Petrucon's default.[15] The parties agreed in Section 7: Hartford's responsibilities to Iron Branch were the same as Petrucon's to Iron Branch, and once Iron Branch agreed to pay the balance of the Construction Contract, Hartford must complete the Construction Contract and pay additional damages for "legal, design professional and delay costs" resulting from Petrucon's default and liquidated damages, or if none are specified in the Construction Contract, actual damages caused by the delayed or non-performance of Petrucon.[16] The damages available under Section 7 are qualified by the parties' agreement Hartford is only liable for the damages for which Petrucon would be liable.[17]

3

### *Petrucon defaults.*

Iron Branch declared Petrucon in default on or about January 30, 2019.[18] It claimed failure to supply enough properly skilled workers or proper materials, payment failures to subcontractors, disregard for applicable laws, and "other substantial breaches."[19] Iron Branch terminated the Construction Contract effective February 12, 2019.[20] Iron Branch notified Hartford of the termination and agreed to pay the balance of the Construction Contract price to Hartford as Surety or a contractor selected to perform the Construction Contract under the Performance Bond.[21] Iron Branch satisfied all conditions precedent to trigger Hartford's obligation under the Performance Bond.[22]

### *Hartford hires a new contractor.*

Hartford chose to fulfill its surety obligations by hiring Delmarva Veteran Builders LLC to complete the renovations.[23] Iron Branch, Delmarva, Hartford, the Delaware State Housing Authority, and Capital One, National Association, signed a Tender Agreement confirming Delmarva as the new contractor.[24]

Hartford also paid Iron Branch the difference in the Construction Contract balance and tender price—$438,163.29[25]—as well as certain additional costs incurred by Iron Branch due to Petrucon's default—$72,384.43—including additional electric costs, supplemental supervisions/management costs from November 2018 to March 2019, costs for additional trips of Pando (an energy start testing service), and costs associated with revamping mechanical closets.[26]

Iron Branch released Hartford from its obligations under the Construction Contract Performance Bond but reserved the right to recover certain damages under the Performance Bond from Hartford.[27] Hartford, on the other hand, reserved *all rights and defenses* under the applicable agreements, as well as Petrucon's rights and defenses, and specifically provided its payment of

damages under the Tender Agreement is without prejudice to its defenses to Iron Branch's claim for additional damages under Section 7.2 and 7.3.[28]

### *Iron Branch demands more damages from Hartford.*

Iron Branch then demanded an additional $1,849,857.48 from Hartford under the Performance Bond.[29] Iron Branch based its new demand on calculations derived from outside consultant Kirschbaum Consulting LLC describing Iron Branch's purported lost rental income; cost for relocation of tenants; subcontractor, consulting, and legal costs; Iron Branch project management time costs; extended financing costs; and lost tax credits.[30]

Hartford denied Iron Branch's claim.[31] It argued Hartford's liability could not be greater than Petrucon's under Section 7 of the Performance Bond.[32]  Hartford relied on language where Iron Branch and Petrucon agreed to waive consequential damages in the Construction Contract, which Iron Branch, Hartford, and Petrucon expressly incorporated into the Performance Bond by reference.[33]

Iron Branch then sued Hartford for breach of contract and for a declaratory judgment seeking to enforce the terms of the Performance Bond.

## II.   Analysis

The parties now cross-move for summary judgment presenting competing views on how we should interpret their obligations for consequential damages under the Construction Contract and Performance Bond. [34] Hartford argues Iron Branch is not entitled to the additional damages for lost rental income, costs for relocation of tenants, subcontractor, consulting, and legal costs, Iron Branch project management time costs, extended financing costs, and lost tax credits.  It argues Iron Branch may not recover because (1) the Construction Contract is incorporated by reference into the Performance Bond; (2) Hartford's obligations under the Performance Bond are

co-extensive with Petrucon's obligations under the Construction Contract; and (3) because Iron Branch waived claims for consequential damages, Hartford is not liable for most of Iron Branch's claimed damages. Iron Branch disagrees, arguing Section 7 of the Performance Bond provides Iron Branch may recover damages from Hartford despite its waiver of consequential damages in the Construction Contract because the Construction Contract's general incorporation is insufficient to overcome the Performance Bond's express grant.

Iron Branch seeks damages from Hartford under Section 7 of the Performance Bond, which includes the two sentences requiring our interpretation.  In the first sentence, Hartford and Petrucon agree Hartford's responsibilities to Iron Branch are the same as Petrucon's responsibilities under the Construction Contract.[35] In the second sentence, they agree Hartford is expressly obligated to complete the Construction Contract and pay specifically enumerated damages resulting from or caused by Petrucon's delay or non-performance.[36] Iron Branch argues the second sentence in Section 7 confirms Hartford's liability extends beyond Petrucon's under the Construction Contract by specifically enumerating a list of damages available to Iron Branch from Hartford.

The issue is whether Hartford agreed in the Performance Bond to pay Iron Branch more than Petrucon agreed in the Construction Contract.[37] We begin our analysis with the overriding backdrop known to suretyship law: the common law coextensive liability principle holding a surety's liability is no greater than its principal's liability.[38] We must then look to the express terms of the Performance Bond to see if the surety agreed to more than the law provides.

Iron Branch's theory is belied both the common law coextensive liability principle and by other language its Construction Contract where it broadly waived all claims for consequential damages and enumerated damages, including those "incurred by [Iron Branch] for rental expenses,

for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons."[39]

We find no genuine issue of material fact on this core issue. Iron Branch may not recover consequential damages from Hartford expressly waived in the Construction Contract but may recover damages not precluded by the Construction Contract. Our finding is consistent with the common law coextensive liability principle holding a surety's liability is no greater than its principal's as well as the express terms of the Performance Bond.

### A.    Iron Branch cannot recover consequential damages from Hartford.

The parties ask us to interpret the Construction Contract and Hartford's Performance Bond. This issue is one of contract interpretation. "Under Delaware law, contract interpretation is a question of law."[40] Usual standards of contract interpretation apply to a contract of suretyship, unless the surety is uncompensated.[41] "A court applying Delaware law to interpret a contract is to effectuate the intent of the parties."[42] "[T]he Court must first determine whether a contract is unambiguous as a matter of law."[43] If unambiguous, the court must "give effect to the plain-meaning of the contract's terms and provisions," and "[i]n upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[44] A court must not render any part of the contract mere surplusage or render any provision or term "meaningless or illusory."[45] "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[46]

### 1.    The Construction Contract and Performance Bond are unambiguous.

The Construction Contract and Performance Bond are unambiguous. A contract is ambiguous "[w]hen the provisions in controversy are fairly susceptible of different interpretations

or may have two or more different meanings."[47] But a contract will not be deemed ambiguous merely because "the parties do not agree upon its proper construction."[48] Iron Branch concedes the contracts are unambiguous, and Hartford does not challenge this concession. We agree neither contract is ambiguous because they are susceptible to but one reasonable interpretation when read together.

     **2.**     **The Performance Bond incorporates the Construction Contract and dictates Hartford's obligations to Iron Branch.**

The Performance Bond is the proper place to begin determining Hartford's obligations.[49] The Performance Bond incorporates the Construction Contract by reference in Section 1.[50] Its incorporation is unqualified and unlimited.[51] When, as here, the bond expressly incorporates the Construction Contract by reference, both the Performance Bond and Construction Contract must be read together to "ascertain the intent of the parties" as it relates to Hartford's obligations.[52]

The parties agreed in Sections 1 and 7 of the Performance Bond as to Hartford's obligations to Iron Branch. Its obligations are co-extensive with the obligations Petrucon owed to Iron Branch under the Construction Contract. Section 1 specifically incorporates the Construction Contract into the terms of the Performance Bond: "The Contractor and Surety, jointly and severally, bind themselves . . . to the Owner for the performance of the Construction Contract, **which is incorporated herein by reference.**"[53] Section 7 then defines Hartford's potential liability under the Performance Bond.[54] Hartford's liability under Section 7 is qualified by the first sentence: "If the Surety elects under Sections 5.1, 5.2 or 5.3, **then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract,** and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract."[55] The express terms of the Performance Bond make clear the Construction Contract is incorporated—without qualification—and Hartford's liability to Iron

Branch is coextensive with Petrucon's liability under the Construction Contract.[56] Because Iron Branch waived claims for all consequential damages against Petrucon, as well as the damages specifically enumerated, Hartford is also not liable to Iron Branch for consequential damages or those specifically waived under the express terms of the Performance Bond.[57]

Iron Branch disputes Hartford's liability is coextensive with Petrucon's liability contending Hartford expanded its obligations under the second sentence of Section 7 of the Performance Bond: "Subject to the commitment by [Iron Branch] to pay the Balance of the Contract Price, [Hartford] is obligated, without duplication, for .1 the responsibilities of [Petrucon] for correction of defective work and completion of the Construction Contract; .2 additional legal, design professional and delay costs resulting from [Petrucon's] Default, and resulting from the actions or failure to act of [Hartford] under Section 5; and .3 liquidated damages, if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of [Petrucon]."[58]

We do not agree. Iron Branch's cited authorities do not analyze the first sentence of Section 7—or one similar—which expressly incorporates the common law coextensive liability principle, nor do they analyze the interplay of a damages waiver in the Construction Contract with the purported grant of damages in the Performance Bond. The parties agreed Hartford's obligation to Iron Branch would "not be greater than those" of Petrucon under the Construction Contract. We do not dispute a surety may expand or limit its obligations under the terms of a bond. But Iron Branch fails to show Hartford expanded its liabilities.

We are similarly unpersuaded by Iron Branch's argument the contract incorporation only defines performance obligations and has no relation to liabilities. This interpretation contradicts the persuasive authority.[59] In *Hicks & Warren LLC v. Liberty Mut. Ins. Co.*, Judge Scheindlin

construed a "modified AIA . . . 312 performance bond," which had a similar general incorporation clause.[60] Judge Scheindlin determined whether the surety must pay attorney's fees under the performance bond.[61] The two possible bases for recovery were under Section 1 of the bond—incorporating the construction contract by reference, which allowed for attorney's fees to the prevailing party—and Section 6—providing for "completion of the Construction Contract" and "legal costs . . . resulting from [the contractor's] default."[62] In denying the motion for partial summary judgment under bond Section 1, Judge Scheindlin found "[p]aragraph 1 of the Bond incorporates by reference the terms of the Contract, without express limitation; thus [the surety's] liability under the Performance Bond is coextensive with [the contractor's] under the Contract . . ."[63] In denying the motion as to Section 6.1—completion of the construction contract—Judge Scheindlin rejected the surety's argument "completion" meant only actual completion of the project and not other obligations, such as attorney's fees.[64]

We are persuaded by an Illinois appellate court's finding the waiver of claims provision in the construction contract is incorporated into the performance bond by reference.[65] The court, construing Delaware law as we are today, rejected the plaintiff's argument the waiver of claims provision only applied to the owner, contractor and subcontractors, reasoning "[a]s a general rule, the liability of a surety is measured by the liability of its principal" and "[s]uch coextensive responsibility has been interpreted to mean that where a bond is signed by a general contractor as principal and by an insurance company as surety, no suit on the bond can be maintained against the surety unless it could have been maintained against the principal."[66] The court further rejected the plaintiff's argument regarding available defenses, finding "[t]he rights and defenses of the principal belong to the surety by virtue of the relationships created by the surety contract."[67] Finally, the court found the waiver of claims provision applied to the sureties because "the bonds

. . . expressly incorporated the terms of the underlying construction contracts . . . Since the performance bonds and the contract are to be read as a single document, the provisions of the contract are also the provisions of the bond."[68]

We are also persuaded by a Massachusetts appellate court's finding "the construction contract, as the clearly identified antecedent, is thus made a part of the bond itself . . . To restrict, as [the contractor] would have it, the incorporation by reference language in the bond to 'work' or 'performance,' as opposed to the contract in its entirety, does violence to the bond's terms."[69]

We find further support in Judge Thornton's finding in the Circuit Court of Florida a waiver of consequential damages in the construction contract an "express" waiver and "incorporated into the bond by reference."[70] Judge Thornton reasoned "the owner chose the form of the bond it used and chose to include the waiver of consequential damages;" therefore, the owner waived consequential damages as to the surety.[71] Judge Demarest, sitting in the Supreme Court, Kings County, New York, also found the surety could not be liable to the owner for consequential damages under the performance bond because the waiver of consequential damage provision in the underlying bonded construction contract applied to the surety and waived the damages.[72]

Iron Branch's interpretation also contradicts the plain language of the parties' agreement in Section 7 of the Performance Bond—which applies the coextensive liability principle to the liability section. The first sentence of Section 7—"If the Surety elects under Sections 5.1, 5.2 or 5.3, **then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract**, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract" —incorporates the common law principle a surety's liability is coextensive with its principal.[73] The sentence appears immediately before a purported grant of damages available under the Performance Bond. While

the Performance Bond allows for the enumerated damages, it only does so only to the extent Petrucon would be liable to Iron Branch under the Construction Contract.

We also disagree with Iron Branch's strained reading of "responsibilities" in Section 7 to only mean actual physical performance of the Construction Contract and not encompassing liabilities. We look to dictionaries to determine the plain meaning of undefined terms.[74] Black's Law Dictionary defines "responsibility" as "responsibility n. (18c) 1. The quality, state, or condition of being duty-bound, answerable, or accountable; LIABILITY (1) . . . 4. That for which one is answerable or accountable; a trust, duty, or obligation. 5. Ability to meet monetary or contractual obligations; esp., the ability to pay what is owed."[75]

Petrucon's "responsibilities" encompass its liabilities to Iron Branch as Petrucon would be "duty-bound, answerable, or accountable" for damages—just as it would be for physical performance of the Construction Contract. "Responsibility" references "liability" and encompasses an "obligation." Iron Branch's argument is contrary to the plain meaning of the word "responsibility" and basic principles of contract interpretation.

### 3.   Hartford benefits from Iron Branch's waiver of consequential damages.

Hartford's liability to Iron Branch is coextensive with Petrucon's liability to Iron Branch. If Petrucon is not liable for a category of damages then neither is Hartford. We now turn to the Construction Contract. Hartford argues Section 15.1.6 - Claims for Consequential Damages - limits Hartford's liability under Section 7 of the Performance Bond. Iron Branch disagrees. We agree Section 15.1.6 limits Hartford's liabilities to Iron Branch.

Section 15.1.6 of the Construction Contract provides a broad waiver of "all consequential damages due to either party's termination in accordance with Article 14" as well as provides a specific enumerated list of damages deemed consequential by agreement and expressly waived.[76]

The parties agreed to waive claims against each other for consequential damages arising out of or relating to the Construction Contract. [77] This mutual waiver includes:

      *      damages incurred by Iron Branch for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

      *      damages incurred by Petrucon for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the work.[78]

The parties agreed the mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination" under Article 14 and "nothing contained in this Section 15.1.6 shall be deemed to preclude an award of liquidated damages, when applicable, in accordance with the requirements of the Contract Documents."[79]

We construe the Performance Bond and Construction Contract together to determine the intent of the parties: Section 15.1.6 of the Construction Contract is incorporated into the Performance Bond by Section 1; Performance Bond provision 5.3, which Hartford elected to proceed under, obligates Hartford to "obtain bids or negotiated proposals from qualified contractors acceptable to [Iron Branch] for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence . . . and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Prince incurred by the Owner as a result of the Contractor Default;" the damages available to Iron Branch under the Performance Bond are set forth in Section 7; and Section 7 expressly limits the damages available to Iron Branch from Hartford to the damages available to Iron Branch from Petrucon under the Construction

Contract, thus preventing Iron Branch from recovering any damages expressly waived in Section 15.1.6.[80]

The parties do not cite—and we did not find—binding authority from our Court of Appeals or Delaware courts analyzing the interplay of Section 7 in the Performance Bond and Section 15.1.6 of the Construction Contract or similar provisions. We are instead persuaded by the two courts cited by the parties and legal commentary addressing the interplay of substantially similar language.[81]

The United States Bankruptcy Court for the Eastern District of North Carolina addressed the interplay of two provisions substantially similar to those we address.[82] The contractor and the surety moved for partial summary judgment on an owner's claim for consequential damages.[83] The surety argued its liability is coextensive with the contractor and it is entitled to rely on the mutual waiver of consequential damages clause found in the underlying construction contract.[84] Judge Humrickhouse agreed with the surety and found the relationship between the surety and contractor "one of suretyship" and while the bond ultimately defines the surety's liability, "the general rule regarding a surety's liability for its principal's default is that a 'surety can only be obligated to perform under the bond to the extent that the principal is obligated under the construction contract.'"[85] Judge Humrickhouse held the surety's derivative liability for the contractor's default arises out of the construction contract with a mutual waiver of consequential damages. The owner cannot recover to the extent its claims are consequential damages against the surety deriving from the contractor's breach of the bonded contract.[86]

Judge Robinson in the United States District Court for the Southern District of New York applied the same reasoning.[87] In *Homes for America Holdings, Inc. v. United States Fidelity & Guaranty Co.*, the owner entered into a building contract with a contractor who in turn obtained a

performance bond from a surety.[88] The contractor defaulted, and the owner terminated the contract and requested the surety take over the construction project.[89] The owner and surety signed a contract where the surety, under the performance bond, would complete the construction contract.[90] The owner ultimately sued the surety and hoped to allege the contractor's delays before notice of default and the surety taking over the construction are damages covered under the performance bond. Judge Robinson partially allowed the claim finding some but not all of the newly claimed damages are barred by the waiver in the construction contract: "where, as here, the parties waive consequential damages under a Construction Contract, the surety's obligation for such damages are waived as well. This is because the Performance Bond provides that, following execution of the takeover agreement, [the surety's] obligation under the Construction Contract 'shall not be greater than those of the Contractor under the Construction Contract.' *See Performance Bond* ¶ 6 . . . Thus, while plaintiff may claim damages under the Performance Bond, it may not claim consequential damages, as defined – and waived – under the original construction contract."[91]

We agree with the sound reasoning of Judges Humrickhouse and Robinson. Hartford's liability to Iron Branch is limited by Iron Branch's waiver in Section 15.1.6 in the Construction Contract. Our finding is grounded in the unambiguous terms of the Performance Bond and Construction Contract. The sophisticated parties in the construction industry must understand the law as it existed at the time of contracting, including the general principles of surety law both parties cite in their briefs and basic principles of contract interpretation under Delaware law.[92] At the time of signing the Performance Bond—which took place days after Iron Branch signed the Construction Contract with Petrucon—the parties agreed to incorporate the Construction Contract by reference and Iron Branch expressly waived its claim for consequential damages under the same

contract. Hartford could read the Performance Bond—with the incorporated Construction Contract—and know its liability to Iron Branch would not be greater than Petrucon's due to Iron Branch's explicit waiver of the consequential damages in the Construction Contract.

**B.      Hartford may be liable following trial for some, but not all, of Iron Branch's claimed additional damages.**

Having determined Hartford's liability to Iron Branch does not include damages waived in Section 15.1.6, we turn to whether Iron Branch waived all the damages it now seeks.[93]

The parties agreed to waive "consequential damages arising out of or relating to the Contract" including, "without limitation . . . all consequential damages due to either party's termination in accordance with Article 14."[94] The parties deemed certain damages explicitly waived: "This mutual waiver includes .1 damages incurred by [Iron Branch] for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons . . . ."[95] Hartford argues all Iron Branch's claimed damages are consequential under common law or waived by Section 15.1.6. Iron Branch disagrees, arguing all of its damages are direct, which it can recover under Sections 7.2 or 7.3 of the Performance Bond and none of which are precluded by the Section 15.1.6 waiver.

Iron Branch waived damages "for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons."[96] In reviewing an unambiguous contract between two sophisticated parties, we must "give effect to the plain-meaning of the contract's terms and provisions," and "[t]he [c]ourt cannot make for the parties a better agreement than that which they bargained for and cannot afford protection to a party which the contract does not provide."[97] Under the plain language of the Construction Contract, as incorporated into the Performance Bond, Iron Branch waived the damages explicitly enumerated in Section 15.1.6—irrespective of whether those

16

damages may be considered "direct" at common law.[98] We cannot rewrite the parties' agreement and deem contractually waived damages not waived. But if the category of damages purportedly sustained by Iron Branch does not fit within an enumerated waived damage, we must then turn to common law to determine whether the damage sustained is consequential, as Section 15.1.6 applies to all consequential damages arising out of or relating to the Construction Contract.

Consequential damages "are those that result naturally but not necessarily from the wrongful act, because they require the existence of some other contract or relationship . . . The distinction between direct and consequential damages is the degree to which the damages are a foreseeable and highly probable consequence of a breach."[99] Whether a damage is direct or consequential is a fact intensive inquiry.[100]

We first consider which, if any, of Iron Branch's claimed categories of damages are waived by the enumerated list of damages in Section 15.1.6. To the extent it is not, we turn to common law to determine whether it is consequential or direct.

### 1.   Iron Branch waived claims for lost rental income.

Iron Branch alleges it sustained "lost rental income" as a result of Petrucon's default.[101] Iron Branch explicitly waived "damages . . . for . . . loss[] of income."[102] Iron Branch may not collect damages for its lost rental income under Section 15.1.6 as incorporated in Section 7 of the Performance Bond.[103]

### 2.   Iron Branch waived claims for the costs of relocating its tenants.

Iron Branch argues "[d]uring the period of construction, tenants that had been living in the buildings prior to the renovation were relocated to temporary housing at the expense of [Iron Branch]. Iron Branch paid these tenants' monthly rent and other moving related expenses."[104] "But for the Contractor Default," Iron Branch argues it would not have incurred the claimed costs for

relocation of tenants because units would have been available for the tenants to move into had the construction been completed on time.[105] Iron Branch seemingly concedes this damage falls within Section 15.1.6's waiver of "losses of use, income or profit."[106] Hartford does not argue it falls within the enumerated damages waived, rather Hartford relies on a Superior Court of North Carolina case finding a similar cost to be consequential under North Carolina's common law principles. We find these damages fall within Section 15.1.6's waiver for "damages incurred by [Iron Branch] for losses of use, income, profit." Our decision would still be the same under the common law.

Hartford argues this damage is a consequential damage as a matter of law citing the Superior Court of North Carolina's decision in *Crescent University City Venture, LLC v. AP Atlantic, Inc.*[107] The North Carolina court characterized student relocation and operation costs as consequential when the owner housed tenants in temporary housing if they renewed their lease during repair of defective construction. The owner described the relocation and operation costs incurred as "its best efforts to keep tenants by providing relocation packages."[108] The court, applying North Carolina law, found the damages could not "accurately be characterized as direct damages" because "these expenses are not such damages 'as might accrue to any person similarly injured'. . . but are particular to [the owner] in this case."[109] Unlike the tenants in North Carolina, Iron Branch's tenants resided in the apartments being renovated by Petrucon under the Construction Contract, and Iron Branch undertook the expense to relocate them to temporary housing during the construction.[110] Petrucon defaulted and did not complete the construction as expected by Iron Branch, causing Iron Branch to purportedly incur additional costs of relocation in the form of additional rent it covered for the tenants.[111] We find these costs are consequential damages as they "require some other contract or relationship" to be incurred; namely, a

18

relationship between Iron Branch and the tenants it agreed to relocate. Iron Branch argues these

damages are direct because they "resulted from the undisputed failure to complete the work within

the specified time."[112] It is true these damages "result naturally" from Petrucon's default. But they

do not result "necessarily from the wrongful act"—Petrucon's default—because they require the

existence of Iron Branch's relationship with the relocated tenants to be sustained. Iron Branch's

costs for relocation of tenants is a consequential damage waived by Section 15.1.6.

### 3.    Iron Branch waived fees for the Kirschbaum report, but issues of fact preclude finding it waived claims for all legal fees.

Iron Branch alleges "[a]s a direct result of [Petrucon's] default and the Project delay," it

"has been forced to incur and pay a variety of subcontractor, consulting, and legal costs."[113] Iron

Branch argues issues of fact preclude summary judgment on whether these costs are recoverable

under Section 7.2 or 7.3 of the Performance Bond and Section 15.1.6 of the Construction Contract

as incorporated.[114] Hartford agrees as to many of the claimed costs, but asks us to rule on two

issues.[115] Hartford argues (1) the fees for preparing the Kirschbaum report are not recoverable as

a matter of law under the terms of the Performance Bond and are consequential; and (2) after

acknowledging issues of fact, we should issue a ruling recovery is precluded "to the extent" legal

fees sought are not "incidental legal costs."[116]

We start by again looking at the plain terms of the Performance Bond. Section 7.2 provides

Hartford "is obligated, without duplication, for . . . .2 additional legal, design professional and

delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act

of the Surety under Section 5."[117] In the event liquidated damages are not specified, Section 7.3

allows for "actual damages caused by delayed performance or non-performance of [Petrucon.]"[118]

Hartford argues the Kirschbaum report is an unrecoverable legal cost performed at the

behest of Iron Branch's counsel to prepare the Performance Bond claim. Iron Branch argues it is

recoverable under Section 7.2 or 7.3. Hartford relies on the Court of Appeals for the Second Circuit's decision in *U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Oil Services Co.*, addressing whether "legal costs" in this standard form bond encompassed attorney's fees the obligee incurred in litigation between the surety and obligee.[119] The court of appeals found the bond's language providing for "legal costs" "not unmistakably clear . . . the Bond[] was intended to obligate the Sureties to pay the Obligees' attorneys' fees in litigation between the Sureties and the Obligees over the Bonds."[120]

We find issues of material fact as to whether the Performance Bond covers the cost of the Kirschbaum report as a legal cost or one "resulting from [Petrucon's] default" or "caused by delayed performance of non-performance" of Petrucon. The parties disagree about the reason for obtaining the Kirschbaum report and the extent to Iron Branch's counsel's involvement or role in obtaining the report. The parties also disagree on whether Iron Branch incurred this added cost as a "result of" the default or if Petrucon's delayed performance caused the cost. In their disagreement, the parties do not cite – or provide – undisputed, material facts allowing us to determine coverage under the Performance Bond as a matter of law.

But even if the cost of the Kirschbaum report is covered under the Performance Bond, these costs are consequential and barred under Section 15.1.6 of the Construction Contract.[121] As discussed previously, consequential damages "are those that result naturally but not necessarily from the wrongful act, because they require the existence of some other contract or relationship . . . The distinction between direct and consequential damages is the degree to which the damages are a foreseeable and highly probable consequence of a breach."[122] The cost of the Kirschbaum report requires the existence of "some other contract or relationship."[123] Iron Branch argues it incurred the expense to submit the bond claim.[124] Iron Branch concedes the cost requires the

existence of some other relationship or contract – namely the Performance Bond and Tender Agreement. And to be incurred, the cost also requires the relationship between Iron Branch and Kirschbaum. As such, while the cost may "result naturally" from Petrucon's default, it does not result "necessarily" from Petrucon's breach of the Construction Contract.

Iron Branch waived the cost incurred for preparation of the Kirschbaum report under Section 15.1.6 as incorporated by Section 7 of the Performance Bond.

But issues of material fact exist around the recovery of the legal fees – as admitted by Hartford and Iron Branch – making this issue inappropriate for summary judgment. We decline Hartford's invite to issue an advisory opinion on which legal fees, if any, are recoverable.[125]

### 4.    Issues of material fact preclude finding a waiver of Iron Branch's project management time costs.

Iron Branch argues its personnel "redirected more of their time to this Project than would have been necessary absent the default and delay" and "Iron Branch management were required to take on a more active role in managing subcontractors and running the Project site, communicating with lenders and other third parties and handling other Petrucon failures and communications regarding these failures."[126] Iron Branch characterized these costs as "atypical management time spent on the Project."[127] Iron Branch claims its "personnel and management" expended "significant time managing the Work, coordinating the Default process, supporting the Surety's post-termination procurement process, and negotiating the Takeover and Tender Agreements. The added costs sought in this cost component are specific to overseeing the Project, the Default, and the resulting Tender."[128] To calculate the costs, Iron Branch provided Kirschbaum with "Iron Branch['s] personnel provided estimates on actual project management labor expended" and "[t]he hourly rates of each employee."[129]

Hartford argues these costs are barred as "damages incurred by [Iron Branch] . . . for loss of management or employee productivity or of the services of such persons." Iron Branch maintains these costs are a direct damage.

In construing the facts in light most favorable to Iron Branch, genuine issues of material fact preclude us from finding a waiver. We are persuaded by Judge Schmehl's reasoning in *Jay Jala, LLC v. DDG Construction, Inc* where the contractor failed to complete the project, the owner completed the project itself, and then sued the contractor for damages resulting from its breach.[130] Judge Schmehl construed a waiver the same as the one presently before us.[131] The owner alleged damage due to a "project completion fee," which Judge Schmehl deemed "unclear" as to its meaning.[132] Upon review of the record, however, Judge Schmehl found the owner sought fees "to cover its overhead" when it "took over the role of general contractor."[133] Judge Schmehl found this cost would not fall within "the contract's express waiver of damages 'for loss of management or employee productivity or of the services of such persons'" and were direct damages.[134]

Iron Branch alleges its managers had to "take on a more active role in managing subcontractors," "run[] the Project site," "handl[e] . . . Petrucon failures," and "expend significant time managing the Work." Construed most favorable to Iron Branch, a reasonable juror could find Iron Branch's costs arose from Iron Branch having to effectively serve as "general contractor" due to Petrucon's failures.[135] Whether Iron Branch waived these costs presents a fact issue for a jury to decide.

###### 5.    Iron Branch did not waive the costs of extended financing.

Iron Branch argues it paid "additional monthly interest on . . . two loans" "as a direct result from the delay to the Project delivery and schedule" and received a "penal[ty]" from Capital One "for the delay with extension fees and additional extension-related legal fees."[136] Iron Branch

argues these are direct damages at common law citing the Virginia Supreme Court in *Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.*[137] Hartford counters these costs are expressly barred by the enumerated list of waived damages in Section 15.1.6 and relies upon the New York Supreme Court, Kings County's decision in *400 15th St., LLC v. Promo-Pro, Ltd.* for support.[138]

We disagree the Section 15.1.6 list of enumerated damages waives Iron Branch's extended financing costs. The waiver provides "[t]his mutual waiver includes .1 damages incurred by [Iron Branch] for . . . **losses of** use, income, profit, **financing** . . ."[139] Hartford misconstrues the waiver as it applies to financing, attempting to argue it waives all damages incurred for financing and reading out the "losses of" in the provision. The New York case upon which Hartford relies is inapposite as to whether the damage falls within the enumerated category in the waiver, as the case broadly holds the extended financing costs to be consequential without analysis.[140] Because Iron Branch's damages are not damages incurred for losses of financing – and are rather damages incurred due to extending its financing – this damage does not fall within the enumerated list in Section 15.1.6. We next turn to common law.

The damages from extended financing costs, if proven at trial, are recoverable as direct damages.[141] We are aware of conflicting persuasive authority on this issue.[142] But we are persuaded by the reasoning of the Virginia Supreme Court in *Roanake Hospital Association* finding extended financing costs are direct damages: "Customarily, construction contracts, particularly large contracts, require third-party financing. Ordinarily, delay in completion requires an extension of the term of construction financing. The interest costs incurred . . . during such an extended term are predictable results of the delay and are, therefore, compensable direct damages."[143]

We find this reasoning persuasive. The additional interest and penalty purportedly sustained by Iron Branch as a result of Petrucon's default "are the necessary and usual result" of

default and construction delay, and they "flow naturally and necessarily from the wrong." Allowing recovery of the extended financing costs will "compensate [Iron Branch] for the loss that it conclusively presumed to have been foreseen by [Petrucon] from his wrongful act." Petrucon undertook to complete a commercial construction renovation project costing $4,768,762.00. A jury can reasonably find Petrucon knew Iron Branch obtained financing for the renovation before it began construction.[144] A jury can reasonably find Petrucon must have foreseen Iron Branch would sustain extended financing costs because of its default and failure to complete the project in the specified time. The extending financing costs are direct damages flowing naturally from Petrucon's default. If proven at trial, Iron Branch can collect the extended financing damages from Hartford.

### 6.     Iron Branch waived damages for the loss of low-income tax credits.

Iron Branch seeks loss of low-income housing tax credits caused by Petrucon's default.[145] Iron Branch argues these credits "result[] in a dollar-for-dollar tax reduction to the entity's federal income tax," and "delivery of these tax credits was directly and entirely based on the schedule of units and buildings to be available for occupancy agreed to with [Petrucon].[146] Hartford argues these damages are waived as loss of use, profit, and income. Iron Branch maintains the loss of these credits are direct damages.

We agree these damages are waived by the parties' waiver of "losses of use, income or profit." Iron Branch admits in its Performance Bond claim "delivery of these tax credits was directly and entirely based on the . . . units and buildings [being] available for occupancy."[147] Iron Branch sustained the damage because of its loss of use of the buildings caused by Petrucon's delay and default. Had Iron Branch received the credits, its federal income tax would have been reduced,

increasing its profit. Iron Branch expressly waived this damage by agreement, regardless of whether this damage would be a direct damage at common law.

## III.   Conclusion

We grant in part and deny in part the parties' cross-motions. We now proceed into further discovery and potential trial relating to Iron Branch's claim for the damages it did not waive in the Construction Contract.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. The parties prepared a Joint Appendix in support of their cross-motions for summary judgment (D.I. 33 through 33-15). References to the Joint Appendix are by Bates number, for example, "JA1." Defendant Hartford filed its Motion for partial summary judgment and supporting memorandum of law at D.I. 22 and 31 and SUMF at D.I. 25 ("Hartford's SUMF"). Iron Branch filed its Motion for summary judgment and supporting memorandum of law at D.I. 27 and 28 and SUMF at 29 ("Iron Branch SUMF"). Hartford responded to Iron Branch's Motion at D.I. 35 and to Iron Branch's SUMF at D.I. 36 ("Hartford Response to SUMF"). Iron Branch responded to Hartford's Motion at D.I. 38 and Hartford's SUMF at D.I. 39 ("Iron Branch Response to SUMF").

[2] D.I. 29 ¶ 2; D.I. 36 ¶ 2 (disputing the paragraph as to Iron Branch's motivations only but not to the cited fact).

[3] D.I. 25 ¶ 1; D.I. 39 ¶ 1 (disputing documents referenced as contract but not fact cited); D.I. 29 ¶ 1; D.I. 36 ¶ 1.

[4] D.I. 33-1, 33-2 at JA 1–39, 40–47, 48–54; D.I. 33-11 at JA 872-80.

[5] D.I. 33-2 at JA 35, § 14.2.1. "[Iron Branch] may terminate the Contract if [Petrucon]:
.1 repeatedly refuses or fails to supply enough properly skilled workers or proper materials;
.2 fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractors and Subcontractors;
.3 repeatedly disregards applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of a public authority; or
.4 otherwise is guilty of substantial breach of a provision of the Contract Documents."

[6] D.I. 33-2 at JA 47, Article 10; D.I. 29 ¶ 9; D.I. 36 ¶ 9.

[7] D.I. 33-11 at JA 882-83.

[8] D.I. 33-2 at JA 35, § 14.2.4; D.I. 33-2 at JA 42, 49 (striking "insert provisions, if any, for liquidated damages relating to failure to achieve Substantial Completion on time or for bonus

payments for early completion of the Work" and adding "Not Applicable" below); *see also* D.I. 33-11 at JA 883 (HUD/DSHA General Conditions Section 33 designating $0.00 as liquidated damages for each day of delay).

[9] "[Petrucon] and [Iron Branch] waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes: 1. damages incurred by [Iron Branch] for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and 2. damages incurred by [Petrucon] for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Section 15.1.6 shall be deemed to preclude an award of liquidated damages, when applicable, in accordance with the requirements of the Contract Documents." D.I. 33-2 at JA 37, § 15.1.6.

[10] D.I. 33-3 at JA 55–58, 59–62, 63–66.

[11] *Id.*

[12] "[Petrucon] and [Hartford], jointly and severally, bind themselves, their heirs, executors, administrators, successors, and assigns to [Iron Branch] for performance of the Construction Contract, which is incorporated herein by reference." *Id.* at JA 56, § 1.

[13] *Id.*

[14] *Id.* at §§ 3, 5–5.4. Section 3 provides: "If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after
**.1** the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default.  Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;
**.2** the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and
**.3** the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract."

Section 5 provides: "When [Iron Branch] has satisfied the conditions of Section 3, [Hartford] shall promptly and at [Hartford's] expense take on of the following actions:

26

**5.1** Arrange for [Petrucon], with the consent of the owner, to perform and complete the Construction Contract;

**5.2** Undertake to perform and complete the Construction Contract itself, through its agents and independent contractors;

**5.3** Obtain bids or negotiated proposals from qualified contractors acceptable to [Iron Branch] for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by [Iron Branch] and a contractor selected with [Iron Branch's] concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay [Iron Branch] the amount of damages as described in Section 7 in excess of the Balance of the Contract price incurred by [Iron Branch] as a result of the Contractor Default; or

**5.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances: .1 After investigation, determine the amount for which is may be liable to [Iron Branch], and as soon as practicable after the amount is determined, make payment to [Iron Branch]; or .2 Deny liability in whole or in part and notify [Iron Branch], citing the reasons for denial."

[15] *Id.* at §§ 3, 5.3.

[16] *Id.* at JA 57, §§ 7–7.3

[17] *Id.* § 7.

[18] *Id.* at JA 82–85; *see also* D.I. 29 ¶ 34; D.I. 36 ¶ 34.

[19] *Id.* at JA 82–85.

[20] *Id.* at JA 86–87.

[21] *Id.* at JA 90–91.

[22] *Id.* at JA 95–96 ("WHEREAS, the Surety does not dispute the propriety of the default or the termination by the Obligee, and acknowledges that any and all steps and/or condition precedent to triggering the Surety's Performance Bond obligations have been fulfilled and/or waived . . . WHEREAS, the Surety is willing to undertake at the surety's expense the completion of the Original Contract in accordance with the terms of the Original Contract, the Performance Bond, and this Agreement through a Paragraph 5.3 Tender of Contractor, and in fulfillment of its performance bond obligation under the Original Contract, Surety tenders Tender Contractor to Obligee to complete the Project, under the terms of the Original Contract and upon the terms set forth in this Agreement . . .").

[23] D.I. 33-3, 33-4 at JA 95–121.

[24] *Id.*

[25] D.I. 33-3 at JA 100, ¶ 9.4. "The Remaining Contract Balance ($1,419,079.71) plus the Settlement Value of the Pending Change Orders ($100,000); minus the Tender Price ($1,957,243.00) leaves a deficit of $438,163.29 (the "Deficit"). In connection with the Deficit, [Iron Branch] and [Hartford] agree that, simultaneous with [Hartford's] execution of this Agreement, [Hartford] agrees to pay $438,163.29 to [Iron Branch] . . . ."

[26] *Id.* at ¶ 9.6. The parties agreed Iron Branch incurred "certain damages and costs as a result of" Petrucon's "default and deficiencies." The parties agreed Hartford would reimburse Iron Branch $72,384.43 for those costs.

[27] D.I. 33-4 at JA 101, ¶ 11.1–11.2; 102, ¶ 13 (reserving claims under Section 7.2 and 7.3 of the Performance Bond).

[28] D.I. 33-4 at 102, ¶ 13. Hartford "reserve[d] all rights and defenses under the Performance Bond, the Original Contract, the Contract Documents and at law to any [Iron Branch's] Section 7.2 & 7.3 Claims, as well as [Petrucon's] rights and defenses, in connection with any [Iron Branch's] Section 7.2 & 7.3 Claims." The Tender Agreement further provides Hartford's "agreement to pay the damages claimed by [Iron Branch] in Paragraph 9.6 hereof is without prejudice to [Hartford's] right to raise any defense to any [Iron Branch's] Sections 7.2 and 7.3 Claims." *Id.*

[29] D.I. 33-4–33-11 at JA 122–819.

[30] *Id.*

[31] D.I. 33-11 at JA 822–24.

[32] *Id.*

[33] *Id.*

[34] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.,* 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC,* 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith,* 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.,* 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg,* 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015)).

If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322–23).

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.* (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016)).

[35] D.I. 33-3 at JA 57, § 7.

[36] *Id.* at § 7.1–7.3.

[37] The central issue is one of first impression in this Circuit, and the parties cite—and we found—only two cases addressing the interplay of the waiver of consequential damages in the Construction Contract and Hartford's defined obligations in Section 7 of the Performance Bond. *See In re New Bern Riverfront Dev., LLC*, 521 B.R. 718, 722, 725 (Bankr. E.D.N.C. 2014); *Homes for America Holdings, Inc. v. U.S. Fidelity & Guaranty Co.*, 7:06-cv-04592, D.I. 31.

[38] *See, e.g.*, *Bd. of Pub. Ed. in Wilmington v. Aetna Cas. & Sur. Co.*, 152 A. 600, 602 (Del. Super. Ct. 1930) ("Where a bond is signed by a general contractor as principal and by a surety company as surety, it must be true that the liability of the surety is co-extensive with the liability of the principal and no suit on the bond can be maintained against the surety unless a corresponding suit would be maintainable against the principal.").

[39] D.I. 33-2 at JA 37, § 15.1.6.

[40] *JFE Steel Corp. v. ICI Americas, Inc.*, 797 F. Supp. 2d 452, 469 (D. Del. 2011) (citing *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[41] *Kent Cty. Levy Ct. v. Int'l Underwriters, Inc.*, 1985 WL 149635, at *3 (Del. Ch. July 31, 1985), *aff'd*, 508 A.2d 72 (Del. 1986). Hartford is a compensated surety in this case. D.I. 36, ¶¶ 12–13.

[42] *JFE Steel Corp.*, 797 F. Supp. 2d at 469.

[43] *Id.* (citing *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996)).

[44] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010); *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (quoting *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

[45] *Osborn ex rel. Osborn*, 991 A.2d 1153 at 1159 (quoting *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del.1992)).

[46] *Id.* (quoting *NBC Universal v. Paxson Commc'ns,* 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[47] *GMG Cap. Invs., LLC*, 36 A.3d at 780 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[48] *Id.* (quoting *Rhone–Poulenc Basic Chemicals Co.*, 616 A.2d at 1195).

[49] D.I. 28 at 5; D.I. 31 at 10; *see, e.g., N. Am. Specialty Ins. Co. v. Chichester Sch. Dist.*, 158 F. Supp. 2d 468, 471 (E.D. Pa. 2001) (discussing Pennsylvania law and finding the bond is the proper place to start in determining whether a surety is liable for certain types of damages).

[50] D.I. 33-3 at JA 56, § 1.

"[Petrucon] and [Hartford], jointly and severally, bind themselves, their heirs, executors, administrators, successors, and assigns to [Iron Branch] for the performance of the Construction Contract, which is incorporated herein by reference."

[51] *Id.*

[52] *Royal Indem. Co. v. Alexander Indus., Inc.*, 211 A.2d 919, 920 (Del. 1965); *see also* 4A Bruner & O'Connor Construction Law § 12:10 ("In construing the surety's obligation under a construction bond, the terms of the bond and the bonded contract are to be construed together."); 4A Bruner & O'Connor Construction Law § 12:35 ("The obligee's measure of damages recoverable under a performance bond depends in large part upon the terms of the bond and the bonded contract.").

[53] D.I. 33-3 at JA 56, § 1; *see, e.g., Hicks & Warren LLC v. Liberty Mut. Ins. Co.*, 2011 WL 2436703, at *5 (S.D.N.Y. June 16, 2011) ("Paragraph 1 of the Bond incorporates by reference the terms of the Contract, without express limitation; thus [the Surety's] liability under the Performance Bond is coextensive with [the Contractor's] under the Contract . . .").

[54] D.I. 33-3 at JA 57, § 7; *see, e.g., Travelers Cas. & Sur. Co. of Am. v. A.G. Cullen Constructions, Inc.,* 2009 WL 3166437, at *5 (W.D. Pa. Sept. 29, 2009) (citing *N. Am. Speciality Ins. Co. v. Chichester Sch. Dist.*, 158 F.Supp.2d 468, 472 (E.D. Pa. 2001)) (finding language substantially similar to the language at issue here "defines" the Surety's "potential liability under the bond").

[55] D.I. 33-3 at JA 57 (emphasis added).

[56] D.I. 33-3 at JA 56–57, §§ 1, 7; *see, e.g., Bd. of Pub. Ed. in Wilmington*, 152 A. at 602.

[57] D.I. 33-2 at JA 37, § 15.1.6; D.I. 33-3 at JA 56–57, §§ 1, 7.

[58] D.I. 33-3, at JA 57, § 7–7.3.

[59] *See, e.g.*, *Hicks & Warren LLC v. Liberty Mut. Ins. Co.*, 2011 WL 2436703, at *5 (finding the general incorporation of the construction contract in paragraph 1 of the performance bond meant the surety's liability was coextensive with the contractor's under the construction contract); *Travelers Cas. & Sur. Co. of Am.*, 792 N.E.2d at 1016 ("We think that the judge erred in construing the incorporation by reference language in the bond as limited in scope to work to be performed under the contract. To insist on such an interpretation, one must lose sight of the interplay between the construction contract and the bond, and ignore governing case law in this Commonwealth."); *see also Vill. of Rosemont v. Lentin Lumber Co.*, 494 N.E.2d 592, 603 (Ill. App. Ct. 1986) (finding waiver of damages provision in bonded contract applied to surety because bond incorporated terms by reference); *Victoria Management, LLC v. Dooleymack Constructors of South Florida, LLC*, 2016 WL 9130882, at *1 (Fla. Cir. Ct. Aug. 05, 2016) (holding same); *400 15th St., LLC v. Promo-Pro, Ltd.*, 960 N.Y.S.2d 341 (N.Y. Sup. Ct. 2010) (holding same).

[60] *Hicks & Warren LLC*, 2011 WL 2436703, at *1 ("Paragraph 1 of the Performance Bond provides that Stegla and Liberty 'jointly and severally' bind themselves to HW for the 'performance of the Construction Contract,' which is 'incorporated [t]herein by reference.'").

[61] *Id.*

[62] *Id.* at *5–6.

[63] *Id.* at *5.

[64] *Id.*

[65] *Vill. of Rosemont*, 494 N.E.2d at 603.

[66] *Id.* at 602–03.

[67] *Id.*

[68] *Id.* We observe the waiver of claims provision differs from the one before us today. This is immaterial to the issue.

[69] *Travelers Cas. & Sur. Co. of Am.*, 792 N.E.2d at 1016.

[70] *Victoria Management, LLC*, 2016 WL 9130882, at *1.

[71] *Id.*

[72] *400 15th St., LLC*, 960 N.Y.S.2d 341.

[73] D.I. 33-3 at JA 57, § 7; *see also Bd. of Pub. Ed. in Wilmington*, 152 A. at 602.

[74] *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006); *Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 360 (3d Cir. 2014) ("We look to the dictionary definition

of officer for "assistance in determining the plain meaning" of this undefined term . . . We look here first "because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract" and citing Black's Law Dictionary and Merriam Webster) (citing *Lorillard Tobacco Co.*, 903 A.2d at 738); *see also JFE Steel Corp.*, 797 F. Supp. 2d at 469 ("If the language of the contract is unambiguous, the Court interprets the contract based on the plain meaning of the language contained on the face of the document.").

[75] RESPONSIBILITY, Black's Law Dictionary (11th ed. 2019).

[76] D.I. 33-2 at JA 37, § 15.1.6.

[77] *Id.* Claim is defined as "a demand or assertion of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract.

[78] D.I. 33-2 at JA 37, § 15.1.6.

[79] *Id.* "Contract Documents" are "enumerated in the Agreement between [Iron Branch] and [Petrucon] . . . and consist of the Agreement, Conditions of the Contract (General, Supplementary, and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract . . . Unless specifically enumerated in the Agreement, the Contract Documents do not include the advertisement or invitation to bid, instructions to Bidders, sample forms, or other information furnished by the Owner in anticipation of receiving bids or proposals, the Contractor's bid or proposal, or portions of Addenda relating to bidding requirements." D.I. 33-1 at JA 9, § 1.1.1 (defining the Contract Documents).

[80] D.I. 33-2 at JA 37, § 15.1.6; D.I. 33–3 at JA 56-57, §§ 1, 7–7.3; *see also Vill. of Rosemont*, 494 N.E.2d 592 at 603 (finding waiver of consequential damages provision in bonded contract applied to surety because bond incorporated terms by reference); *Victoria Management, LLC*, 2016 WL 9130882, at *1 (holding same); *400 15th St., LLC*, 960 N.Y.S.2d 341 (holding same).

[81] *In re New Bern Riverfront Dev., LLC*, 521 B.R. 718, at 725; *Homes for America Holdings, Inc.*, 7:06-cv-04592, D.I. 31; *see, e.g.*, 4A Bruner & O'Connor Construction Law § 12:16, n. 15 (discussing consequential damage waiver in Section 15.1.6 in the A201-2007 and commenting "[s]ince the surety's liability is coextensive with that of the contractor under the bonded contract, the mutual waiver by the owner and contractor of the right to claim consequential damages should limit the surety's liability for such damages as well."); 72 C.J.S. Principal and Surety § 80 ("Although a surety is bound to perform whatever may be legally required of its principal, a surety is not liable to an obligee unless its principal is also liable. Accordingly, a surety is not liable on a surety contract if the principal has not incurred liability on the primary contract."); *but see* FIDELITY AND SURETY BONDS, LIM MA-CLE 16-1 (discussing confusion Section 15.1.6 presents for sureties because it is not imminently clear it benefits sureties).

---

[82] *In re New Bern Riverfront Dev., LLC*, 521 B.R. at 725 (finding the construction contract contained a mutual waiver of consequential damages and discussing the bond language, which provided "if Travelers elects to act under (1)–(3) above, its responsibilities "shall not be greater than those of the Contractor under the Construction Contract." *Id.* However, Travelers is also obligated for '[a]dditional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety.'); *see also* D.I. 33-11 at JA 891–93 (waiver of consequential damages included in underlying bonded construction contract in *In re New Bern*).

[83] *Id.* at 722.

[84] *Id.*

[85] *Id.* at 722–23 (quoting *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1468 (4th Cir.1991)).

[86] *Id.* at 723. Judge Humrickhouse also noted the owner of the construction project seeking the damages did not disagree with his finding. Judge Humrickhouse ultimately denied the surety's partial summary judgment because the owner sought recovery of non-derivative consequential damages from the surety's conduct under the bond which could not be precluded or limited by the waiver in the construction contract. *Id.* at 725. Non-derivative damages are not at issue in the case before us, and Judge Humrickhouse later granted the surety's motion for reconsideration and granted summary judgment in its favor on the non-derivative consequential damages as well. *See* D.I. 32 at SA 1-8, *New Bern Riverfront Dev., LLC v. Weaver Cooke Constr., LLC* (*In re New Bern*), Adv. Pro. No. 10-23-8-SWP (Bankr. E.D.N.C. Mar. 3, 2015).

[87] *Homes for America Holdings, Inc.*, 7:06-cv-04592, D.I. 31, Amended Memorandum Decision and Order re: Motion for Leave to File Amended Compl. and Cross Mot. for Summ. J. 1–2 (noting plaintiff waived all claims for consequential damages under paragraph 4.3.10 of the construction contract and discussing the bond provided enumerated categories of damages: "These categories include: 1) additional legal, design professional and delay costs resulting from the Contractor's default, and resulting from the actions or failure to act of USF&G in taking over or arranging for the takeover of the Construction Contract, see Complaint Ex. B ("the Performance Bond") ¶ 6.2; and 2) liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor. Id. at ¶6.3").

[88] *Id.* at 1.

[89] *Id.* at 1–2.

[90] *Id.* at 2.

[91] *Id.* at 4–5. The court also grounded its reasoning in Bruner & O'Connor Construction Law § 12:16 n.10 (2006), finding: "In addition, commentators have noted that, with respect to these

standard industry agreements, 'the mutual waiver by the owner and the contractor of such right to claim consequential damages should limit the surety's obligation for such damages as well.'"

[92] "A reading of an agreement must be reasonable when the contract is 'read in full and situated in the commercial context between the parties' . . . [T]he basic business relationship between the parties must be understood to give sensible life to any contract." *Symbiont.io, Inc. v. Ipreo Holdings*, LLC, 2021 WL 3575709, at *26 (Del. Ch. Aug. 13, 2021) (citing *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017)).

[93] Iron Branch released Hartford in the Tender Agreement from "any and all claims, demands, rights, obligations, and/or causes of action of whatever kind or whatever nature . . . under or arising out of the Contract, the Bonds, and the Project, except for the Surety's obligations under this Agreement and as provided in Paragraphs 6, 12, and 13 of this Agreement." Of relevance here are claims for damages reserved in Paragraph 13 of the Tender Agreement – claims under Section 7.2 and 7.3 of the Performance Bond. To the extent Iron Branch argues it is entitled to damages from Hartford under other provisions in the Construction Contract or the Performance Bond, we find Iron Branch waived its rights to pursue those claims through the Tender Agreement.

[94] D.I. 33-2 at JA 37, § 15.1.6.

[95] *Id.*

[96] *Id.*

[97] *Osborn*, 991 A.2d at 1159–60; *RTN Invs., LLC v. RETN, LLC*, 2011 WL 862268, at *12 (Del. Super. Ct. Feb. 10, 2011) (citing *Palese v. Delaware State Lottery Office*, 2006 WL 1875915, at *4 (Del. Ch. 2006)).

[98] *See, e.g., Smyrna Hosp., LLC v. Petrucon Constr., Inc.*, 2013 WL 6039287, at *4 (Del. Super. Ct. Sept. 27, 2013) (discussing waiver substantially similar to case at hand and finding "[h]ere, the language of the Agreement is susceptible to but one meaning: Petrucon is . . . not [responsible for] consequential damages, as defined by the Agreement"); *see also Jay Jala, LLC v. DDG Constr., Inc.*, 2016 WL 6442074, at *3 (E.D. Pa. Nov. 1, 2016) (construing consequential damages waiver substantially similar to the case at hand and holding "Plaintiff's brief indicates that it has withdrawn its claim for lost profits or loss of income. No doubt it has done so because these damages are quite clearly covered by the waiver. In any event, there is no need for analysis on this category except to note that precisely because it was so clearly waived, it was likely a major driver of this motion and is now moot.").

[99] *WSFS Fin. Corp. v. Great Am. Ins. Co.*, 2019 WL 2323839, at *5 (Del. Super. Ct. May 31, 2019) (also defining direct damages as "those inherent in the breach. Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act."); *see also SLH Gen. Contractor, Inc. v. Ambience Inc.*, 2020 WL 1130325, at *5, n.52 (Del. Com. Pl. Mar. 4, 2020) (explaining consequential damages are special damages and "defining special damages as 'those which are the

34

actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence in the particular case, that is, by reason of special circumstances or conditions').

[100] *Id.* (discussing Court of Chancery opinion in *Frank Investments Ranson, LLC v. Ranson Gateway, LLC*, 2016 WL 76999 (Del. Ch. Feb. 26, 2016) which found the same but in applying West Virginia law).

[101] D.I. 33-4 at JA 127 (Kirschbaum Consulting Report attached to Iron Branch's Bond Claim); D.I. 33-11 at JA 842 (updated Kirschbaum report to update damages incurred submitted to Hartford in December 2020).

[102] D.I. 33-2 at JA 37, § 15.1.6.

[103] Even if we applied common law principles to determine whether lost income is consequential or direct, our outcome is the same. *See, e.g.*, *SLH Gen. Contractor, Inc.*, 2020 WL 1130325, at *6 (discussing difference between direct and consequential damages under Delaware law and finding lost rental income stemmed from the rental lease, which was collateral to the contract at issue, and thus constituted a consequential damage).

[104] D.I. 33-4 at JA-127–28; D.I. 33-11 at JA-842–43.  Hartford does not challenge Iron Branch's contention it paid moving costs and rent for its relocated tenants. It appears Iron Branch undertook additional obligations regarding payment of relocated tenants' rent. *Compare* D.I. 33-9 at JA 695–99 (providing Iron Branch's relocation plan as Exhibit N to Iron Branch's Amended and Restated Agreement of Limited Partnership and setting forth tenants would be relocated on property and pay their own rent), *with* D.I. 33-4 at JA-127–28 and D.I. 33-11 at JA-842–43 (Kirschbaum report discussing Iron Branch paid rent for relocated tenants). Hartford does not dispute Iron Branch paid the rent. Because we find the damages consequential and thus waived, and the parties do not argue whether Iron Branch actually paid the rent, we do not endeavor to parse the facts but note the apparent inconsistency in the record.

[105] D.I. 33-4 at JA-127–28; D.I. 33-11 at JA-842–43.

[106] D.I. 38 at 25.

[107] 2019 WL 3765313, at *14 (N.C. Super. Aug. 8, 2019).

[108] *Id.* at *16.

[109] *Id.* at *1–6, 16.

[110] D.I. 33-4 at JA-127–28; D.I. 33-11 at JA-842–43.

[111] *Id.*

[112] D.I. 38 at 25.

[113] D.I. 33-4 at JA 128; D.I. 33-11 at JA 843.

[114] D.I. 38 at 24–25.

[115] D.I. 31 at 23–24.

[116] *Id.*

[117] D.I. 33-3 at JA 57.

[118] *Id.*

[119] *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 77 (2d Cir. 2004). In reviewing the court's reasoning in *N. Am. Specialty Ins. Co. v. Chichester Sch. Dist.*, the court observed "[a] careful reading of the district court's analysis reveals that the court seemed to base its conclusion—that the surety would be liable for the obligee's attorneys' fees regardless of litigation—on the fact that the surety would be liable for the obligee's "legal fees incurred by its solicitor in administering the problems resulting from" the contractor's default "had th[e] lawsuit never been commenced." . . . The fact that the bond language provides that, in the event of a default, a surety may be liable to its obligee for costs in "administering the problems resulting from [the] default" **supports, if anything, the view that the "legal costs" contemplated by the drafters of the AIA 312 bond form were purely administrative in nature**—e.g., the incidental legal costs that reasonably arise when the obligees must retain counsel to assist in drafting or redrafting contracts and related documents, as necessary to complete the project." Hartford relies on the emphasized dicta in support of its argument.

[120] *Id.*

[121] The enumerated list of waived damages does not encompass the Kirschbaum report. *See* D.I. 33-2 at JA 37, § 15.1.6 ("The mutual waiver includes .1 damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons . . .").

[122] *WSFS Fin. Corp.*, 2019 WL 2323839, at *5; *see also SLH Gen. Contractor, Inc.*, 2020 WL 1130325, at *5, n. 52 (explaining consequential damages are special damages, citing *Twin Coach Co. v. Chance Cought Aircraft, Inc.*, 52 Del. 588, at 603 (Del. Super. Ct. 1960) and "defining special damages as 'those which are the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence in the particular case, that is, by reason of special circumstances or conditions').

"Direct damages are those inherent in the breach. Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act." *See WSFS Fin. Corp*, 2019 WL 2323839, at *4.

[123] *Id.*

[124] D.I. 39, ¶ 11.

[125] "A claim is fit for adjudication if a 'declaratory judgment would in fact determine the parties' rights, as distinguished from an advisory opinion based on a hypothetical set of facts.'" *Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 523 (3d Cir. 2018) (further citation omitted).

[126] D.I. 33-4 at JA 129; D.I. 33-11 at JA 844.

[127] *Id.*

[128] D.I. 29, ¶ 56(d); D.I. 36, ¶ 56 (Hartford did not dispute this SUMF).

[129] D.I. 33-4 at JA 129; D.I. 33-11 at JA 844.

[130] *Jay Jala, LLC*, 2016 WL 6442074, at *3.

[131] *Id.*

[132] *Id.* at *3.

[133] *Id.*

[134] *Id.* at *4. The court also noted defendant did not argue it, as Hartford argued here.

[135] Unlike in *Jay Jala LLC*, Iron Branch did not undertake to complete the construction project itself. But Iron Branch's allegations are sufficient to create a fact issue as to whether Iron Branch acted as a "general contractor" because of Petrucon's default – resulting in added costs.

[136] D.I. 33-4 at JA 130; D.I. 33-11 at JA 845.

[137] 214 S.E.2d 155 (Va. 1975).

[138] 960 N.Y.S.2d 341 (N.Y. Sup. Ct. 2010).

[139] D.I. 33-2 at JA 37 (emphasis added).

[140] 960 N.Y.S.2d 341 (N.Y. Sup. Ct. 2010) ("Plaintiff's claim for the two point extension loan fee and additional interest, which resulted from its refinancing of its construction loan, also constitutes a claim for consequential damages expressly excluded by section 4.3.10 of the General Conditions.").

[141] We note Hartford does not argue the extended financing costs are not recoverable under Section 7 of the Performance Bond as it did with the Kirschbaum report fees.

---

[142] *See, e.g. 400 15th St., LL*, 960 N.Y.S.2d 341 (finding extended financing costs are consequential damages); *Bartram, LLC v. C.B. Contractors, LLC*, 2011 WL 1299856, at *3 (N.D. Fla. Mar. 31, 2011) (finding the same); *Jay Jala, LLC*, 2016 WL 6442074, at *6 (finding extended financing costs direct damages); *Chestnut Hill Dev. Corp. v. Otis Elevator Co.*, 739 F. Supp. 692, 703 (D. Mass. 1990) (finding same); *Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.*, 214 S.E.2d 155, 160–61 (Va. 1975).

[143] *Roanoke Hosp. Ass'n.*, 214 S.E.2d at 160–61.

[144] *See, e.g.* D.I. 33-3 at JA 64-65 (performance bond adding Delaware State Housing Authority and Capital One as obligees on the bond day after execution of contract but before notice of proceed date to begin construction).

[145] D.I. 33-4 at JA 130; D.I. 33-11 at JA 845-46.

[146] D.I. 33-4 at JA 130-31; D.I. 33-11 at 845-46.

[147] *Id.* at 130; 846.